IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                     :
JAMES M. JANG and                    :        3:15 CV 1243 (JBA)
ANNA S. PARK                         :
                                     :
v.                                   :
                                     :
LIBERTY MUTUAL FIRE INSURANCE CO.    :
                                     :        DATE: FEBRUARY 22, 2018
-------------------------------------------------------x
```

RECOMMENDED RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On August 19, 2015, plaintiffs James M. Jang and Anna S. Park commenced this action against defendant Liberty Mutual Fire Insurance Company ["defendant" or "Liberty"](Dkt. #1), which complaint was superseded by an Amended Complaint filed on September 9, 2015 (Dkt. #10) in which plaintiffs allege coverage for damages sustained from their home's crumbling foundation under the Homeowners Policy issued by defendant. Specifically, plaintiffs assert the following three counts: breach of contract (Count One); breach of implied covenant of good faith and fair dealing (Count Two); and unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practices Act ["CUIPA"] and the Connecticut Unfair Trade Practices Act ["CUTPA"](Count Three). (Id.). On December 18, 2015, defendant filed its answer and affirmative defenses. (Dkt. #18).

On August 15, 2017, defendant filed the pending Motion for Summary Judgment (Dkt. #34), with brief (Dkt. #35), and Local Rule 56(a)1 Statement of Material Facts and exhibits (Dkt. #36)[1] in support. On September 5, 2017, plaintiffs filed their brief in opposition, with

---

[1]The following twenty-two exhibits are attached: copy of plaintiffs' home insurance policy, issued by defendant under Policy Number H32-218-137330-40 ["Policy"] (Exh. A); affidavit of Chataignier Red, sworn to August 14, 2017 (Exh. B); copy of deposition transcript of plaintiff James Jang, taken May 17, 2017 (Exh. C); claim denial letter, dated August 11, 2015 (Exh. D); copy of deposition transcript of David Grandpré, taken July 14, 2017 (Exh. E); copy of report of William F. Neal, PE of Residential Engineering Services, LLC, dated March 24, 2015 (Exh. F); copy of May 11,

Local Rule 56(a)2 Statement of Material Facts and exhibits.  (Dkt. #37).[2]   Defendant filed

its reply brief with exhibits attached on September 19, 2017.  (Dkt. #38).[3]   Two months

_____

2007 home inspection report by Michael Cunningham of Great Pro-Spects, LLC (Exh. G); copy of report by David Grandpré, dated November 7, 2016, with photographs attached (Exh. H); copy of report of Petrographic Examination, dated November 22, 2016 (Exh. I); copy of State of Connecticut Department of Consumer Protection Residential Property Condition Disclosure Report, dated October 23, 2014 ["Disclosure Report"] (Exh. J); copy of Disclosure Report, dated May 14, 2015 (Exh. K); copy of Liberty Policy, dated June 22, 2007 (Exh. L); copy of deposition transcript of David Grandpré, taken May 26, 2017 in Dino v. Safeco Inc. Co. of Am. et al, Civ. Docket No. TTD-CV-16-6010428-S (Conn. Super. Ct)(Exh. M); copy of transcript of hearing before U.S. District Judge Honorable Stefan R. Underhill in Roberts et al v. Liberty Mut. Fire Ins. Co., No. 3:13 CV 435 (SRU), November 10, 2016 (Exh. N); copy of Notice of Supplemental Authority, dated March 3, 2017, filed in the Roberts case (Exh. O); copy of report by Carl S. Cianci, P.E., dated February 3, 2016 (Exh. P); copy of Office of the Attorney General's report, dated July 7, 2016 (Exh. Q); copy of webpage from Department of Consumer Protection Website, "About Concrete Foundations and our Investigation" (Exh. R); copy of Public Act No. 16-45, "An Act Concerning Concrete Foundations" (Exh. S); copy of notice from Department of Insurance regarding foundations (Exh. T); copy of Report on Deteriorating Concrete in Residential Foundations, dated December 30, 2016 by the Connecticut Department of Consumer Protection (Exh. U); and, copy of Notice of Termination and Release of Deposit, dated June 5, 2015 (Exh. V).

[2]Attached to plaintiffs' brief in opposition is an affidavit of Jeffrey R. Lindequist, sworn to September 5, 2017 (Exh. AA) with the following ten exhibits attached: copy of Plaintiffs' Responses to the Defendant's Interrogatories and Requests for Production, Inspection and Examination, dated August 31, 2016 (Exh. 1); copy of Property Assessor's Card for 56 Stonefield Trail, South Windsor, CT (Exh. 2); copy of defendant's Activity Log/Diary dated August 11, 2015 (Exh. 3); copy of two proposals prepared by JAD Basement Systems, LLC, dated April 21, 2015 (Exh. 4); copy of Proof of Service, dated August 26, 2015 (Exh. 5); copy of denial of coverage letter issued by Liberty Mutual Fire Insurance Company to Michael and Annette Roberts, dated January 10, 2013 (Exh. 6); copy of denial of coverage letter issued by Liberty Mutual Insurance Company to Dave and Linda Mensher, dated April 21, 2015 (Exh. 7);  copy of denial of coverage letter issued by Liberty Mutual Fire Insurance Company to Nathan Wojtyna, dated September 22, 2015 (Exh. 8); copy of denial of coverage letter issued by Liberty Mutual Fire Insurance Company to David Roy, dated October 15, 2014 (Exh. 9); and  copy of denial of coverage letter issued by Liberty Mutual Fire Insurance Company to John Celentano, dated May 16, 2014 (Exh. 10).

Additionally, the following three exhibits are attached to plaintiffs' brief in opposition: copy of Memorandum of Decision: Defendant's Motion for Summary Judgment in Roy v. Liberty Mutual Fire Ins. Co., No. CV-15-6009410-S (Conn. Super. Ct. Feb. 22, 2017)(Exh. BB); copy of Ruling on Motion for Summary Judgment in Roberts v. Liberty Mutual Fire Ins. Co., 13 CV 435 (SRU)(D. Conn. Aug. 28, 2017)(Exh. CC); and copy of Order Regarding Motion for Summary Judgment, in Bienkowski v. Liberty Mutual Fire Ins. Co., No. TTDCV 1660100545 (Conn. Super. Ct. Aug. 3, 2017)(Exh. DD).

[3]Attached to defendant's reply brief are the following exhibits: copy of deposition transcript of David Grandpré, taken in Metsack v. Liberty Mutual Fire Ins. Co., 3:14 CV 1150 (VLB), on January 26, 2016 (Exh. W); copy of deposition transcript of David Grandpré, taken in Kowalshyn v. Excelsior Ins. Co. et al, 3:16-cv-148(JAM), on April 28, 2017 (Exh. X); copy of deposition transcript

later, on November 27, 2017, Senior United States District Judge Janet Bond Arterton referred the pending motion to this Magistrate Judge.  (Dkt. #39).

For the reasons set forth below, defendant's Motion for Summary Judgment (Dkt. #34) is granted in part and denied in part.

## II. FACTUAL BACKGROUND[4]

### A. PROPERTY AND INSURANCE

Plaintiffs' property at 56 Stonefield Trail, South Windsor, Connecticut was constructed in 1985, and plaintiffs purchased the property in June 2007.  (Pls.' Local R. 56(a)1 Stmt ¶ 3; Def.'s Local R. 56(a)2 Stmt ¶ 3; see Dkt. #10, Count I, ¶ 4 at 2). Liberty first insured plaintiffs' property on June 22, 2007 under Policy Number H32-218-137330-40 [hereinafter the "Policy"](Pls.' Local R. 56(a)1 Stmt ¶¶ 1-2; Def.'s Local R. 56(a)2 Stmt ¶¶ 1-2; see Dkt. #36, Exhs. A-B; see also Pls.' Local R. 56(a)1 Stmt ¶ 26; Def.'s Local R. 56(a)2 Stmt ¶ 26; see Dkt. #36, Exh. L (the initial Liberty Policy incepted on June 22, 2007)).  Jang first learned of foundation problems when he was trying to sell his house in early 2015 (see Dkt. #36, Exh. H, at 1),[5] and he first reported the claim to Liberty on August 11, 2015. (Pls.' Local R.

---

of David Grandpré, taken in Karas v. Liberty Ins. Corp., 3:13 CV 1836 (SRU), on July 14, 2017 (Exh. Y); and copy of Order Regarding Motion for Summary Judgment in Celentano v. Liberty Mutual Fire Ins. Co., No. TTDCV 1560090185 (Conn. Super. Ct. July 27, 2017)(Exh. Z), with copy of Order Regarding Motion to Reargue/Reconsider, dated August 31, 2017, in the Bienkowski case (Exh. AA); copy of court order in the Bienkowski case, dated September 6, 2017 (Exh. BB); and copy of Order Regarding Motion for Summary Judgment in Piacentini v. The Travelers Home and Marine Ins. Co., No. TTDCV 166103415 (Conn. Super. Ct. Aug. 29, 2017)(Exh. CC).

[4]This factual summary is drawn from the parties' Local Rule 56(a)1 Statements, Local Rule 56(a)2 Statements, and their accompanying affidavits, deposition transcripts, and exhibits.

[5]Jang certified on October 23, 2014 that there were no foundation problems at the Property.   (Pls.' Local R. 56(a)1 Stmt ¶ 24; Def.'s Local R. 56(a)2 Stmt ¶ 24; see Dkt. #36, Exh. J at 3). On December 18, 2014, plaintiffs relocated to California and put the property up for sale (see Dkt. #37, Exh. 1, at 7); to date, they still own the property at issue (see id. at 8-9).  In a May 14, 2015 Disclosure Report, Jang re-certified that there were no foundation problems at the property. (Pls.' Local R. 56(a)1 Stmt ¶ 25; Def.'s Local R. 56(a)2 Stmt ¶ 25; see Dkt. #36, Exh. K, at 3). The

56(a)1 Stmt ¶ 4; Def.'s Local R. 56(a)2 Stmt ¶ 4; <u>see</u> Dkt. #36, Exh. B, ¶ 6).  Jang had

already consulted with his attorneys prior to reporting his claim. (Pls.' Local R. 56(a)1 Stmt

¶ 5; Def.'s Local R. 56(a)2 Stmt ¶ 5; <u>see</u> Dkt. #36, Exh. C at 42-43). Jang did not mention

his attorneys or similar lawsuits brought by his attorneys pertaining to homes in the general

vicinity of his home. (Pls.' Local R. 56(a)1 Stmt ¶ 6; Def.'s Local R. 56(a)2 Stmt ¶ 6; <u>see</u> Dkt.

#36, Exh. C at 45-46, 63). Liberty denied the claim by way of correspondence dated August

11, 2015. (Pls.' Local R. 56(a)1 Stmt ¶ 7; Def.'s Local R. 56(a)2 Stmt ¶ 7; <u>see</u> Dkt. #36, Exh.

D).[6]

B. FOUNDATION

In a May 11, 2007 home inspection report by Michael Cunningham of Great Pro-

Spects, LLC, Cunningham documented "large crack(s)" in the rear foundation.  (Pls.' Local

R. 56(a)1 Stmt ¶ 12; Def.'s Local R. 56(a)2 Stmt ¶ 12; <u>see</u> Dkt. #36, Exh. G at 4).[7]  On

March 24, 2015, William Neal, P.E. prepared a report for Jang.  (Pls.' Local R. 56(a)1

---

June 5, 2015 Notice of Termination and Release of Deposit signed by Jang notes that "[b]ased on
material defects which have been discovered, by the buyers regarding the foundation of the
property, which the sellers failed to disclose…" (Pls.' Local R. 56(a)1 Stmt ¶ 46; Def.'s Local R.
56(a)2 Stmt ¶ 46; <u>see</u> Dkt. #36, Exh. V at 2)(both parties erroneously referred to this exhibit as
Exh. U).

[6]In the denial notice, Liberty stated "we have completed our investigation of your
homeowner's claim, which revealed that the basement wall is collapsing due to settling earth or
movement." (Dkt. #36, Exh. D, at 1).  Liberty cited policy provisions in which Liberty stated, <u>inter
alia</u>, that it does "not insure . . . for loss: . . . [c]aused by . . . [w]ear and tear, marring,
deterioration; . . . [s]ettling, shrinking, bulging or expansion, . . . of . . . foundations . . . .[,]" and
that it does not insure for loss due to, <u>inter alia</u>, "[e]arth [m]ovement," or "[f]aulty, inadequate or
defective . . . [m]aterials used in repair, construction, renovation or remodeling[.]" (<u>Id.</u> at 1-2
(emphasis omitted); <u>see also</u> Dkt. #36, Exh. A at 12-13, 29).

[7]Plaintiffs state that Cunningham clarified that his concern was for a single crack and that
the owner had reported periodic water entry at that crack in the rear of the foundation and at the
hatchway. (<u>See id.</u>; <u>see also</u> Dkt. #37, Exh. 1 at 9 ("Our home inspector noted a crack near the
hatchway prior to our purchase. We were assured that this crack was not a matter of concern
other than a potential entry point for water, which we never experienced.")).

Stmt ¶ 11; Def.'s Local R. 56(a)2 Stmt ¶ 11; see Dkt. #36, Exh. F at 1).  On September 3, 2015, David Grandpré, a licensed professional engineer since 1986, inspected plaintiffs' property (Dkt. #36, Exh. E at 20; Pls.' Local R. 56(a)1 Stmt ¶ 44; Def.'s Local R. 56(a)2 Stmt ¶ 44; see Dkt. #36, Exh. E at 14), and on November 7, 2016, Grandpré completed his report. (Dkt. #36, Exh. H).  The foundation of plaintiffs' home exhibited cracks attributable to the oxidation of iron sulfide minerals in the concrete at the time they submitted their claim to Liberty and at the time that Grandpré inspected the property.  (Pls.' Local R. 56(a)1 Stmt ¶ 8; Def.'s Local R. 56(a)2 Stmt ¶ 8; see Dkt. #36, Exh. E at 11; see also Dkt. #36, Exhs. F, H, I & Dkt. #37, Exh. AA.4).[8]  Grandpré believes that visible map cracking attributable to iron sulfide oxidation constitutes a substantial impairment of structural integrity. (Pls.' Local R. 56(a)1 Stmt ¶ 10; Def.'s Local R. 56(a)2 Stmt ¶ 10; see Dkt. #36, Exh. E at 14).  Grandpré noted that "[s]everal cracks had been patched[]" (Pls.' Local R. 56(a)1 Stmt ¶ 13; Def.'s Local R. 56(a)2 Stmt ¶ 13; see Dkt. #36, Exh. H at 2),[9] and he opined that the foundation is one of the least severely cracked foundations out of the sixty-three that he has observed in connection with his retention by plaintiffs' attorneys. (Pls.' Local R. 56(a)1 Stmt ¶ 27;

---

[8]According to defendant, David Grandpré testified that a foundation wherein the iron sulfide oxidation process is occurring would have map cracking present itself ten to fourteen years after pour. (Def.'s  Local R. 56(a)1 Stmt ¶ 9; see Dkt. #36, Exh. E at 18-19).  Plaintiffs add that while Grandpré did not render that opinion with respect to plaintiffs' home, but rather, noted that the deterioration in plaintiffs' home was less severe than typical and that he could only testify to a reasonable degree of engineering certainty that the cracking suggesting that the structural integrity of the walls was substantially impaired had been present for five years. (Pls.' Local R. 56(a)2 Stmt ¶ 9; see Dkt. #36, Exh. E at 32-33).

[9]The parties cited to the wrong page.

Defendant states that Jang never patched any of these cracks and that he never made any repairs. (Pls.' Local R. 56(a)1 Stmt ¶¶ 14-15; Def.'s Local R. 56(a)2 Stmt ¶¶ 14-15; see Dkt. #36, Exh. C at 50).  Plaintiffs, however, add that Jang testified that he did not personally perform any repairs, and he did not recall patching work being done, but remedial work was undertaken by JAD Basement Systems after Neal's report. (Pls.' Local R. 56(a)2 Stmt ¶¶ 14-15; see Dkt. #37, Exh. AA, Exh., at 3-4 & Exh. 4).

Def.'s Local R. 56(a)2 Stmt ¶ 27; see Dkt. #36, Exh. E at 35). Petrographic analysis has confirmed that the cracking is attributable to iron sulfide oxidation. (Pls.' Local R. 56(a)1 Stmt ¶ 16; Def.'s Local R. 56(a)2 Stmt ¶ 16; see Dkt. #36, Exh. I at 7).

### C. STRUCTURAL INTEGRITY

The home is safe to live in (Pls.' Local R. 56(a)1 Stmt ¶ 17; Def.'s Local R. 56(a)2 Stmt ¶ 17; see Dkt. #36, Exh. E at 31), and the foundation walls do not need to be shored. (Pls.' Local R. 56(a)1 Stmt ¶ 18; Def.'s Local R. 56(a)2 Stmt ¶ 18; see Dkt. #36, Exh. E at 29). The foundation walls are partially underground and retain soil on the exterior. (Pls.' Local R. 56(a)1 Stmt ¶ 19; Def.'s Local R. 56(a)2 Stmt ¶ 19; see Dkt. #36, Exh. E at 31, 42). The foundation walls are still holding up the above structure, and the foundation walls are not in imminent danger of falling down. (Pls.' Local R. 56(a)1 Stmt ¶¶ 20-21; Def.'s Local R. 56(a)2 Stmt ¶¶ 20-21; see Dkt. #36, Exh. E at 31-32). Grandpré cannot give a ballpark estimate as to when the basement walls will fall down absent replacement, or when the home will become unsafe unless the foundation is replaced. (Pls.' Local R. 56(a)1 Stmt ¶¶ 22-23; Def.'s Local R. 56(a)2 Stmt ¶¶ 22-23; see Dkt. #36, Exh. E at 31-32).

Grandpré testified that "very good engineer[s]" disagree as to what constitutes a "substantial impairment to structural integrity." (Pls.' Local R. 56(a)1 Stmt ¶ 30; Def.'s Local R. 56(a)2 Stmt ¶ 30; see Dkt. #36, Exh. E at 12-14).[10] Grandpré testified that Liberty's disclosed engineer, Carl Cianci, P.E., is a "very good engineer." (Pls.' Local R. 56(a)1 Stmt ¶ 31; Def.'s Local R. 56(a)2 Stmt ¶ 31; see Dkt. #36, Exh. E at 12). Cianci has opined that the basement walls have not suffered a substantial impairment to structural integrity. (Pls.'

_____

[10]Grandpré testified that "substantial impairment of structural integrity" is not an engineering term of art.  (Pls.' Local R. 56(a)1 Stmt ¶ 43; Def.'s Local R. 56(a)2 Stmt ¶ 43; see Dkt. #36, Exh. E at 11).

Local R. 56(a)1 Stmt ¶ 32; Def.'s Local R. 56(a)2 Stmt ¶ 32; see Dkt. #36, Exh. P at 6).[11]

## III. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

The standard for summary judgment is well established.  The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a). This showing may be made by depositions, affidavits, interrogatory answers, admissions, or other exhibits in the record. FED. R. CIV. P. 56(c)  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment.'" Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 59 (2d Cir. 2006), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown v. Eli Lily & Co., 654 F.3d 347, 358 (2d Cir. 2011), quoting Anderson, 477 U.S. at 249.

### B. STANDARD FOR INSURANCE POLICY INTERPRETATION

The standard for review for interpreting insurance contracts is well established.

[C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo. . . . It is the function of the court to construe the provisions of the contract of insurance . . . . The [i]nterpretation of an insurance policy . . . involves a determination of the intent of the parties as expressed by the language of the policy . .. [including] what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy . . . . [A] contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy . . . [giving the] words . . . [of the policy]

---

[11]Both parties erroneously refer to Exh. O.

7

their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the insured . . . .

Conn. Ins. Guar. Ass'n v. Fontaine, 278 Conn. 779, 784-85, 900 A.2d 18 (2006), quoting Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co., 274 Conn. 457, 462-63, 876 A.2d 1139 (2005)(additional internal quotations & citation omitted).  "[P]rovisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters, and . . . the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." Vermont Mut. Ins. Co. v. Walukiewicz, 290 Conn. 582, 592, 966 A.2d 672 (2009)(citations & internal quotations omitted).  If the terms of the Policy are unambiguous, such terms "must be given their plain and ordinary meaning and extrinsic evidence is inadmissible to determine the meaning."  United Techs. Corp. v. Am. Home Assur. Co., 989 F. Supp. 128, 145 (D. Conn. 1997)(Arterton, J.)(citations omitted).  "If[, however,] the contractual language is ambiguous and subject to varying reasonable interpretations, the issue of the parties' intent is a question of fact, thereby rendering summary judgment inappropriate." Royal Ins. Co. of Am. v. Zygo Corp., No. 3:01 CV 1317 (GLG), 2003 WL 21960734, at *2 (D. Conn. Aug. 15, 2003)(citation omitted).  "[W]hether an insurance policy is ambiguous is a matter of law for the court to decide[,]"  Travelers Cas. & Sur. Co. v. Neth. Ins. Co., 312 Conn. 714, 740, 95 A.3d 1031 (2014), and ambiguous policy language is construed in favor of coverage.  See Conn. Ins. Guar. Assoc., 278 Conn. at 788-89 (citations omitted).  Thus, "where each party has a reasonable but different interpretation of the phrases supported by dictionaries and case law, that indicates that the phrases are ambiguous and must be construed against the insurer."  Roberts v. Liberty Mut. Fire Ins. Co., 264 F. Supp. 3d 394,

404 (D. Conn. 20017)(Underhill, J.)(citations & internal quotations omitted).[12]

C. COVERAGE FOR THIS CLAIM

The Liberty Policy, as modified by its endorsements, states in part that Liberty does not insure "for loss . . . [i]nvolving collapse other than as provided in Additional Coverage 8.[,] . . . [c]aused by . . . freezing, thawing, pressure or weight of water or ice, . . .to a[] . . . [f]oundation, . . . [,] or . . . [f]ooting[,]" or for loss caused by "[w]ear and tear, marring, deterioration; . . .[i]nherent vice, latent defect, . . . [or,] [s]ettling, shrinking, bulging or expansion including resultant cracking, of pavements, patios, foundations, walls, roofs, or ceilings[.]" (Dkt. #36, Exh. A at 11, 26).[13]  The "Additional Coverages[,]" Liberty insures

_____

[12]In Roberts, U.S. District Judge Stefan R. Underhill provided a detailed "overview of the problem of crumbling foundations in northeastern Connecticut[.]" Id. at 399-401.  This case, like Roberts, is one in a "series of cases in this district in which Connecticut homeowners have brought claims against their insurers related to the deterioration of their concrete basement walls." Id. at 399-400 (footnote & multiple citations omitted).

[13]Specifically, the Liberty Policy states in part:

---

**SECTION I—PERILS INSURED AGAINST**

**COVERAGE A—DWELLING and COVERAGE B—OTHER STRUCTURES**
We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:

1.　　Involving collapse, other than as provided in Additional Coverage 8.;

2.　　Caused by:
. . . .
　　b.　 Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:
　　　. . . .
　　　(2)　　Foundation, retaining wall, or bulkhead; or
　　　. . . .
　　　(4)　　Footing(s)
　　　. . . .
　　e.　 Any of the following:

　　　(1)　　Wear and tear, marring, deterioration;

　　　(2)　　Inherent vice, latent defect, mechanical breakdown;

"direct physical loss to covered property involving collapse of a building or any part of a building caused by . . . [h]idden decay[,] . . . or . . . [u]se of defective material or methods in construction, remodeling or renovation . . . ." (Id. at 10, 28).

_____

> (3)    Smog, rust or other corrosion;
> . . . .
> (6) Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

(Dkt. #36, Exh. A at 11, 26).

> . . . .

> **ADDITIONAL COVERAGES**

> . . . .
> 8.    **Collapse**. We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

> a.    Perils Insured Against in COVERAGE C—PERSONAL PROPERTY. These perils apply to covered buildings and personal property for loss insured by this additional coverage:

> b.    Hidden decay;

> c.    Hidden insect or vermin damage;

> d.    Weight of contents, equipment, animals or people;

> e.    Weight of rain which collects on a roof; or

> f.    Use of defective material or methods in construction, remodeling or renovation;

> Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

> Collapse does not include settling, cracking, shrinking, bulging or expansion.

(Id. at 10, 28).

According to plaintiffs, the threshold question in this case is whether there has been a "collapse of a building or any part of a building" such that the collapse coverage provided by the Additional Coverages section of the homeowner's policy would be triggered.  (Dkt. #37, at 8).  Specifically, plaintiffs contend that the "collapse" at issue in this case was the result of a "chemical reaction occurring within the walls of the home [which] is not only a form of hidden decay, but also the result of improper materials used in the construction of the basement walls."  (Id. at 9 (footnote omitted); see Dkt. #36, Exh. H, at 3-4). Plaintiffs' engineering expert opines that the "concrete used at the Jang property contained a compound, . . . which was subjected to a chemical reaction[]" that "initially damaged the inside of the concrete on a microscopic level[,]" and "[e]ventually the expansion became visible at the surface of the walls."   (Dkt. #36, Exh. H at 3).

As plaintiffs acknowledge, there has been no "catastrophic 'tumbling down' or 'falling down' that one often associates with the word 'collapse.'" (Dkt. #37, at 9-10).  Rather, plaintiffs assert that the condition of their home constitutes a "collapse" as defined by the Connecticut Supreme Court in Beach v. Middlesex Mut. Assurance Co., 205 Conn. 246, 252, 532 A.2d 1297 (1987).  (Dkt. #37, at 10-14).  In Beach, the policy language excluded from coverage loss from "settling, cracking, shrinkage, bulging or expansion of . . . foundations . . . unless . . . collapse of a building . . . not otherwise excluded ensues . . . ."  205 Conn. at 250.  The Connecticut Supreme Court held that the  term "collapse" is "sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building[]" that "subsequently develops out of a loss that appeared, at its inception, to fall within the rubric of 'settling, cracking, shrinkage, bulging or expansion.'"  Id. at 251-52 (multiple citations omitted).  As former Chief Judge Ellen Ash Peters explained in Beach,

"[r]equiring the insured to await an actual collapse would not only be economically wasteful; but would also conflict with the insured's contractual and common law duty to mitigate damages." Id. at 253 n. 2 (internal citation omitted); see also id. at 252-53 (citing the "distinct minority[]" of cases which hold that "'collapse' unmistakably connotes a sudden falling in, loss of shape, or flattening into a mass of rubble[]"); but see Clough v. Allstate Ins. Co., No. 3:17 CV 140 (JBA), 2017 WL 3763841, at *4-5 (D. Conn. Aug. 29, 2017)(Allstate has limited its coverage by requiring that collapse be "sudden and accidental" such that a process of hidden decay does not trigger coverage until a sudden collapse occurs. The insured must wait until "some portion of the house . . . eventually collapse[s], at which time [the insured] may seek coverage."); Adams v. Allstate Ins. Co., No. 3:16 CV 1360 (JBA), 2017 WL 3763837, at *3-4 (D. Conn. Aug. 29, 2017)(same).

Defendant contends that the policy at issue in Beach "has a markedly different collapse provision[,]" and by defining collapse in the negative by excluding from coverage "settling, cracking, shrinking, bulging or expansion[,]" as was done in Nida v. State Farm Fire & Cas. Co., 454 So. 2d 328, 334 (La. App.), writ denied, 458 S. 2d 486 (1984), this policy is significantly different from the one at issue in Beach. (Dkt. #35, at 14-15 (citation omitted)). Defendant argues that in light of this difference in language, "substantial impairment of structural integrity' is not the standard for 'collapse'[.]" (Dkt. #35, at 15).

In Beach, the Connecticut Supreme Court observed that "[i]f the defendant wished to rely on a single facial meaning of the term 'collapse' . . ., it ha[d] the opportunity expressly to define the term to provide for the limited usage it now claims to have intended." 205 Conn. at 251, citing Nida, 454 So. 2d at 334. In this case, defendant asserts that Liberty has done just that with the provision excluding settling, cracking, shrinkage, or expansion. (Dkt.

#35, at 14-15).  Instead, defendant argues that Beach is not binding authority, but rather, a recently decided case from the California Court of Appeals, Tustin Field Gas & Food, Inc. v. Mid-Century Ins. Co., 13 Cal. App. 5th 220 (Cal. Ct. App. 2017), is the authority this court should follow. (Dkt. #35, at 14-15).  In Tustin Field, the California Court of Appeals upheld the trial court's conclusion that "because the Policy exclud[ed] 'settling' and the like, a 'substantial impairment of structural integrity' is not a 'collapse' as a matter of law."  13 Cal. App. 5th at 228 (citation omitted).  This conclusion is consistent with California law. See Doheny West Homeowners' Ass'n v. American Guar. & Liability Ins. Co., 60 Cal. App. 4th 400, 405-06 (Cal. Ct. App. 1997).  Connecticut law, however, governs this case.

Moreover, a slight difference in policy language found in Liberty policies has been addressed by this Court in Bacewicz v. NGM Ins. Co., No. 3:08 CV 1530 (JCH), 2010 WL 3023882, at *6 (D. Conn. Aug. 2, 2010).  In Bacewicz, now-Chief Judge Janet C. Hall concluded that although the policy language in that case differed slightly from the language in Beach in that "collapse" did not include "cracking and bulging[,]" the cracking and bulging "may have been symptomatic of chemical decomposition occurring within the concrete of the basement walls," which would not "preclude a reasonable jury from concluding that [the insurer] is liable from failing to cover an substantial impairment to structural integrity caused by such decomposition."  Id.  Judge Hall also found that "it is difficult – if not impossible – to imagine any 'collapse' that did not at some point manifest itself in the form of cracks, bulges, or other physical deformities."  Id.  Similarly, the standard articulated in Beach has been applied to the policy language at issue in this case.  See Roberts, 264 F. Supp. 3d at 404-09; Belz v. Peerless Ins. Co., 46 F. Supp. 3d 157, 163 (D. Conn. 2014)(Hall, J.). Accordingly this Court concludes that Beach is the binding authority in this case. The next

question, therefore, is whether there exists an issue of fact as to whether the structural

integrity of plaintiffs' home has become structurally impaired.

Defendant argues extensively that even under <u>Beach</u>, the cracking that has occurred

in plaintiffs' home is not a "collapse[,]" and therefore, the claim is properly excluded under

the terms of the Policy. (Dkt. #35, at 15-21).   However, there are two dueling expert

opinions on this issue, thereby clearly establishing an issue of material fact.[14]  According to

Grandpré, the concrete basement walls of plaintiffs' home are "substantially structurally

impaired."  (Dkt. #36, Exh. H at 4). Liberty's expert, Cianci, agrees that there is map

cracking in the foundation of plaintiffs' home, "indicative of a material defect with the original

concrete used to pour the foundation[,]" but Cianci opines that the foundation "is not in

imminent danger of collapse, or in a state of collapse[,]" and the "observed condition . . . is

not a substantial impairment to the structural integrity of a building[.]" (<u>Id.</u>, Exh. P, at 7).

At this stage of the case, it is not the Court's role to weigh the credibility of the evidence of

the record and of these two experts' testimony.   See Gabriel v. Liberty Mut. Fire Ins. Co.,

No. 3:14 CV 1435 (VAB), 2017 WL 6731713, at *6 (D. Conn. Dec. 29, 2017).  Thus, the issue

of whether there exists a substantial impairment of the structural integrity of plaintiffs' home

---

[14]Liberty has attached its engineering expert's report to its motion for summary judgment, which report this Court has reviewed in its entirety (see Dkt. #37, Exh. P), as it has done for all the exhibits here.  As stated above, Cianci, Liberty's expert, opines that the walls of plaintiffs' home have not been substantially impaired, whereas  Grandpré has opined that the walls of plaintiffs' home are "substantially structurally impaired[.]" (See Dkt. #36, Exh. H at 4; id., Exh. P at 7).  As plaintiffs appropriately point out, in its moving brief, Liberty does not reference Cianci's report as such report contradicts Grandpré's opinion regarding the structural integrity of plaintiffs' home. (Dkt. #37, at 11 n.5). Liberty, however, does reference Cianci's report in its reply brief.  (Dkt. #38, at 4).

The parties agree that Grandpré was introduced to the phrase "substantial impairment of structural integrity" by Attorney Michael Parker sometime in or around 2009 in connection with their collaboration in the <u>Bacewicz</u> case. (Pls.' Local R. 56(a)1 Stmt ¶ 45; Def.'s Local R. 56(a)2 Stmt ¶ 45; see Dkt. #36, Exh. E at 14-15).

is a matter left for the jury.[15] See id. ("Because, on the record currently before this Court, a jury could conclude that the damage amounted to a substantial impairment, a genuine issue of fact remains for resolution at trial.")(citation omitted); Roberts, 264 F. Supp. 3d at 414 ("[T]he losses to the Robertses' basement walls are not excluded from coverage as a matter of law. Whether the Robertses have proved that their walls suffered a 'substantial impairment of [ ] structural integrity' remains a matter for the jury to decide"); Metsack, 2017 WL 706599, at *6 ("a material dispute exists regarding whether this damage is sufficiently 'substantial' to constitute a 'collapse' under the Liberty Mutual Policy's terms"); Belz v. Peerless Ins. Co., 204 F. Supp. 3d 457, 463-64 (D. Conn. 2016)("[t]he question of whether the damage was covered under the 'collapse' provisions of the insurance policy cannot appropriately be resolved at the summary judgment stage and should be left for the jury"), recon. denied, 13 CV 1315 (VAB), 2016 WL 6542828 (D. Conn. Nov. 3, 2016).

### 1. TIMING OF THE LOSS

Defendant contends that the Policy at issue "only responds to loss which occurs during the Policy[,]" (Dkt. #35, at 9; Dkt. #36, Policy at 20), and asserts the claimed damages predate the June 22, 2007 Policy. (Dkt. #35, at 10). Additionally, defendant points to the "Suit Against Us" provision in the Policy to argue that "[e]ven if any aspect of the claim were covered . . . , it is barred" by this provision. (Id. at 11-12).[16]

---

[15]The Court also notes that this argument along with the other arguments asserted by Liberty in connection with this underlying motion have been raised by Liberty and persuasively rejected several times by courts in this District. See Roberts, 264 F. Supp. 3d at 410-414; Metsack, 2017 WL 706599, at *5-6; Belz v. Peerless Ins. Co., 204 F. Supp. 3d 457, 463-64 (D. Conn. 2016)("[t]he question of whether the damage was covered under the 'collapse' provisions of the insurance policy cannot appropriately be resolved at the summary judgment stage and should be left for the jury"), recon. denied, 13 CV 1315 (VAB), 2016 WL 6542828 (D. Conn. Nov. 3, 2016).

[16]The time limitations for filing an insurance claim with Liberty are as follows: "**Suit Against Us**. No action can be brought unless the policy provisions have been complied with and

The foundation was poured on this property in 1985. (Dkt. #10, Count 1 ¶ 4, at 2). Defendant argues that Grandpré's testimony that map cracking would present itself ten to fifteen years after the pour, and the opinion of plaintiffs' engineer, Neal, that the cracks in the foundation are attributable to a chemical reaction which become visible fifteen-to-twenty years after the pour, place the loss outside the Policy.  (Dkt. #35, at 10).

Grandpré inspected plaintiffs' property on September 3, 2015.  (Dkt. #36, Exh. E at 32). As plaintiffs acknowledge, Grandpré opined that the cracking at plaintiffs' property "was somewhat less severe than [he] has seen at other properties. So the certainty that it was cracked more than five years [prior to his visit to the property in 2015] was at a lower level of engineering certainty."  (Id. at 33).  This time frame places plaintiffs within the Policy period.  Similarly, Neal's report does not offer a specific time frame as to plaintiff's property, but rather stated that the Alkali-Silica-Reaction "typically causes this type of distress to be visible [fifteen] to [twenty] years after the foundation is poured."  (Dkt. #36, Exh. F).  At this stage of the case, viewing this in the light most favorable to plaintiffs, a material issue exists as to the timing of this cracking, which effects whether the claim falls with the "Policy Period" provision.  See Metsack, 2017 WL 706599, at *6 (in light of the record on summary judgment, a material issue exists as to whether a covered collapse occurred before or during the period covered by the Liberty Mutual Policy); Belz, 204 F. Supp. 3d at 464-66.[17]

_____

the action is started within one year after the date of loss.[]"; "**Policy Period**. This policy applies only to loss in Section I or 'bodily injury' or 'property damage' in Section II, which occurs during the policy period." (Dkt. #36, Policy at 15 & 20)(emphasis in original).  "Contractually-imposed time limitations to suit have long been recognized as enforceable by both federal and Connecticut courts." Bacewicz, 2010 WL 3023882, at *7, citing Air Brake Sys., Inc. v. TUV Rheinland of North America, Inc., 699 F. Supp. 2d 462, 472 (D. Conn. 2010)(collecting cases).

[17]Plaintiffs also argue that Liberty's policies are triggered when applying a "multiple injury trigger" analysis. (Dkt. #37, at 17-18); see United Techs., 989 F. Supp. at 152-53; Travelers, 312 Conn. at 754.  However, in light of the conclusion reached above, the Court need not address this

Moreover, the "'date of loss' for purposes of an insurance policy's 'Suit Against Us' provision is the date on which the insured learned or should have learned of the covered loss." Belz, 204 F. Supp. 3d at 465 n.2 (multiple citations omitted); see also Parker v. Worcester Ins. Co., 247 F.3d 1, 4 (1st Cir. 2001)("[I]n the case of a non-obvious injury or loss, the period begins to run only when a reasonable person would have learned of the injury or loss. . .  Absent more explicit language, no one would expect an insured to be stripped of coverage where a reasonable person would not have detected the injury or loss.")(footnote omitted).  In this case, Jang testified at his deposition that he was informed about a pattern of cracks when he was first trying to sell his home in 2014 and the potential buyer had an inspection done (Dkt. #36, Exh. C at 19-20), and he learned of the cracking again when he listed his property in 2015. (Id. at 18-19).  He testified that he noticed small cracks prior to purchasing his home in 2007, but he was told those were "fairly normal[]" given the age of the house.  (Id. at 21).  Additionally, the inspection form completed prior to plaintiffs purchasing the property in 2007 reveals that "[c]ommon [c]racks" were noted, as well as a "[l]arge crack[]" in the rear of the foundation, for which Jang was to watch for water intrusion.  (Dkt. #36, Exh. G at 4; see id., Exh. C at 25-27).  Defendant contends that based on this testimony, map cracking was present in the foundation prior to, and thus during, the 2007-2008 Policy term.  (Dkt. #35, at 12).  Jang testified, however, that it was not until 2015, when plaintiffs' realtor suggested bringing in an engineer to inspect that basement that plaintiffs considered that they had a structural problem.  (Dkt. #36, Exh. C at 19-20).  This case was brought five months after Jang's engineer, Neal, issued his report. (See Dkt. #1; Dkt. #36, Exh. F).  Drawing all inferences in plaintiffs' favor, it is possible that

---

argument.

a jury could conclude that plaintiffs could not have known of the "collapse" sooner than Neal's 2015 report, and thus a reasonable jury could find that plaintiffs acted in compliance with the "Suit Against Us" provision of the policy. Accordingly, this issue cannot be resolved on summary judgment.

## 2. CERTIFY QUESTIONS TO THE CONNECTICUT SUPREME COURT

Liberty contends that certification to the Connecticut Supreme Court is warranted to "resolve what 'substantial impairment of structural integrity' means[,]" (Dkt. #35, at 21-24), and both parties point out that in Roberts, Judge Underhill indicated at oral argument that it was a "good idea" to certify to the Connecticut Supreme Court the issue of what constitutes a "substantial impairment of structural integrity[.]" (Pls.' Local R. 56(a)1 Stmt ¶ 29; Def.'s Local R. 56(a)2 Stmt ¶ 29; see Dkt. #36, Exh. N at 12). However, despite commenting that certification was a "good idea[,]" (Dkt. #36, Exh. N at 12), Judge Underhill declined to certify this question. See generally Roberts, 264 F. Supp. 3d at 402, n.4 & 410-12.

Liberty also argues that Queen Ann Park Homeowners Ass'n v. State Farm Fire and Cas. Co., 183 Wash. 2d 485, 352 P.3d 790 (Wash. 2015), sets forth the proper standard for "substantial impairment of structural integrity[.]" (Dkt. #35, at 22). In that case, the Washington Supreme Court held that the term "collapse" in the policy at issue in that case means the "substantial impairment of structural integrity[,]" which, when considering the policy as a whole, that court defined as "the substantial impairment of the structural integrity of all or part of a building that renders all or part of the building unfit for its function or unsafe . . . [meaning,] more than mere settling, cracking, shrinkage, bulging, or expansion." Queen Ann Park, 353 P.3d at 491-92.

Less than two months ago, U.S. District Judge Victor A. Bolden addressed this exact argument posited by Liberty, noting that although Liberty "again requests that this court adopt the <u>Queen Anne Park</u> definition of collapse[,] . . . 'Connecticut state and federal courts, . . . consistently have declined to follow the reasoning of <u>Queen Anne</u> and the like cases." <u>Gabriel</u>, 2017 WL 6731713, at *7, <u>quoting Roberts</u>, 2017 WL 3710062, at *8; <u>see also Belz</u>, 204 F. Supp. 3d at 464 ("The Court finds no reason to adopt Washington state law when the standard in Connecticut is relatively clear, nor is there a need for certifying this issue to the Connecticut Supreme Court."); <u>Metsack</u>, 2017 WL 706599, at *5 (finding "no reason to deviate" from the approach in <u>Belz</u>).  Defendant's argument fails before this Court yet again.

<u>3. POLICY TERMS "FOUNDATION" AND "RETAINING WALLS"</u>

The Policy excludes coverage for loss to a foundation or retaining walls unless the loss is a direct result of the collapse of a building.  (Dkt. #36, Policy at 10, 28).  Accordingly, Liberty asserts that the policy terms "foundation" and "retaining walls" are unambiguous (Dkt. #35, at 24-29), and extrinsic evidence reveals that the claimed loss is to the foundation.  (<u>Id.</u> at 29-31).[18]

Liberty asserts that the term "foundation" "unquestionably refers to basement walls[]" (Dkt. #35, at 25); Grandpré testified that the residential building code defines the concrete basement walls as the foundation (Dkt. #36, Exh. E at 41); and the concrete basement walls are considered the foundation in the engineering industry.  (<u>Id.</u> at 41-42).  Additionally, the Office of the Attorney General's report on this issue refers to "foundations" in its "Consumer

---

[18]Jang certified on October 23, 2014 that there were no foundation problems at the Property (Pls.' Local R. 56(a)1 Stmt ¶ 24; Def.'s Local R. 56(a)2 Stmt ¶ 24; <u>see</u> Dkt. #36, Exh. J at 3), and re-certified that there were no foundation problems at the Property in a May 14, 2015 Disclosure Report. (Pls.' Local R. 56(a)1 Stmt ¶ 25; Def.'s Local R. 56(a)2 Stmt ¶ 25; <u>see</u> Dkt. #36, Exh. K, at 3).

Protection Investigation of Crumbling Concrete Home Foundations"; the Department of Consumer Protection has publicized information regarding "resources that can help [homeowners] determine if their concrete foundation is damaged"; and on December 30, 2016, the Department of Consumer Protection issued a "Report on Deteriorating Concrete in Residential Foundations[,]" in which it refers to the map cracking issue of which the plaintiffs complain as concerning concrete foundations. (Pls.' Local R. 56(a)1 Stmt ¶¶ 37-38; Def.'s Local R. 56(a)2 Stmt ¶¶  37-38; Dkt. #36, Exhs. Q, R & U (emphasis added)).[19] Moreover, Public Act No. 16-45, entitled "An Act Concerning Concrete Foundations[,]" repeatedly refers to the map cracking issue of which the plaintiffs complain as concerning the foundation (Pls.' Local R. 56(a)1 Stmt ¶ 39; Def.'s Local R. 56(a)2 Stmt ¶ 39; see Dkt. #36, Exh. S at 1-2),[20] and the Department of Insurance's notice regarding foundations addresses "home foundations that are crumbling or otherwise deteriorating[.]" (Pls.' Local R. 56(a)1 Stmt ¶ 40; Def.'s Local R. 56(a)2 Stmt ¶ 40; Dkt. #36, Exh. T (emphasis added)).[21]

---

[19]The December 30, 2016 Report on Deteriorating Concrete in Residential Foundations prepared by the DCP and OAG to the Connecticut General Assembly noted that "[a] foundation for a residential structure consists of three essential parts. The footing provides the base which supports the foundation walls and the slab forms the floor." (Pls.' Local R. 56(a)1 Stmt ¶ 41; Def.'s Local R. 56(a)2 Stmt ¶ 41; see Dkt. #36, Exh. U at 2 n.1 (the parties erroneously refer to Exh. T).

Grandpré agrees with the definition of "foundation" set forth in the December 30, 2016 DCP and OAG report.  (Pls.' Local R. 56(a)1 Stmt ¶ 42; Def.'s Local R. 56(a)2 Stmt ¶ 42; see Dkt. #36, Exh. E at 42). Grandpré testified that basement walls are defined as part of the foundation in Connecticut residential building code and are considered as such in the engineering industry. (Pls.' Local R. 56(a)1 Stmt ¶ 36; Def.'s Local R. 56(a)2 Stmt ¶ 36; see Dkt. #36, Exh. E at 41-42). Neither Grandpré nor Jang know whether there are footings at the Property, and Jang does not know what a footing is. (Pls.' Local R. 56(a)1 Stmt ¶ ¶ 33-35; Def.'s Local R. 56(a)2 Stmt ¶¶ 33-35; see Dkt. #36, Exh. C at 61-62; id., Exh. E at 27).

[20]The parties erroneously refer to Exh. R. Plaintiffs deny that this legislation has supplied a universal definition of the term for purposes of insurance coverage disputes. (Def.'s Local R. 56(a)2 Stmt ¶ 39).

[21]The parties erroneously refer to Exh. S.

Additionally, Liberty argues that the basement walls are "retaining walls[,]" as defined by the Merriam-Webster dictionary, the Oxford American English dictionary, and the Free Dictionary by Farlex.  (Dkt. #35, at 29).  Plaintiffs point to differing definitions of "retaining wall" as found in other sources, and argues that ample precedent on this issue exists.  (Dkt. #37, at 28).  Plaintiff is correct.

Just as Judge Underhill observed in Karas v. Liberty Ins. Corp., 33 F. Supp. 3d 110, 115 (D. Conn. 2014), in this case, "[e]ach party . . . has a reasonable but different interpretation of the phrases supported by dictionaries and case law, so the phrases are ambiguous, and the insurance policy should be construed against Liberty Mutual." Additionally, Liberty's argument that the terms "foundation" and "retaining walls" are unambiguous is an argument that has been repeated to this Court several times, without success.  See Gabriel, 2017 WL 6731713, at *8; Gabriel, 2015 WL 5684063, at *3; Karas, 33 F. Supp. 3d at 115-16; Belz, 46 F. Supp. 3d at 164; see generally Bacewicz, 2010 WL 3023882, at *3-4.  In light of the volume and weight of case law in this District on this precise issue, the Court concludes that the terms "foundation" and "retaining walls" are ambiguous and should be construed against Liberty.

### B. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Defendant also moves for summary judgment on Count Two – plaintiff's claim of breach of implied covenant of good faith and fair dealing.  (Dkt. #35, at 32-35).  "[E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.  In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 432-33,

849 A.2d 382 (2004)(internal citations, quotations & alterations omitted).  "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  Id. (citations & internal quotations omitted).  Bad faith involves "both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake . . . but by some interested or sinister motive . . . [or] dishonest purpose."  Id. (citation & internal quotations omitted).

Defendant argues here, as it has in similar cases, that this lawsuit "concerns a mere coverage dispute."  (Dkt. #35, at 33); see Roberts, 264 F. Supp. 3d at 414 ("Liberty Mutual argues that . . . 'this lawsuit concerns a mere coverage dispute[.]'").  In Roberts, Judge Underhill found that "[a]lthough Liberty Mutual's position has not prevailed so far, it is not 'unreasonable on its face under existing insurance law,' [so that] Liberty Mutual is entitled to keep making [these arguments]."  264 F. Supp. 3d at 415 (citations omitted).  Accordingly, Judge Underhill concluded that the evidence in the record was not sufficient for a reasonable jury to conclude that Liberty Mutual denied the Robertses' claim in bad faith.  Id.; see also id. at 415 n.10 (noting that a number of judges in this district have found similar allegations sufficient to state a claim for breach of the covenant of good faith and fair dealing at the 12(b)(6) stage).  Conversely, in Metsack, Judge Bryant concluded that although Liberty Mutual's independent adjuster identified causes of cracking, Liberty Mutual's denied the Metsack's claim as resulting from "settling/earth movement" and "ground water intrusion[,]" without "any basis for this conclusion other than a general claim that a 'careful investigation' was conducted."  2017 WL 706599, at *8 (citation & internal quotations

22

omitted).   Accordingly, Judge Bryant held that those facts raise material issues of fact with respect to the Metsack's bad faith claim.   Id.   Similarly, in Belz, summary judgment was denied on the implied covenant claims after "[d]rawing all inferences in favor of the plaintiffs [to conclude that a] genuine factual dispute remains as to whether Peerless[, a member of Liberty Mutual Group,] denied the Belzes' claim with knowledge that the claim was covered under the policy."  204 F. Supp. 3d at 468; see id. at 460.

In this case, Liberty's Senior Field Claims Resolution Specialist, Chataignier Red, avers that Liberty "investigated, [] . . . evaluated[,]" and denied this claim on its own merits.  (Dkt. #36, Exh. B ¶ 9). Similarly, in Cianci's expert report, it is noted that "Liberty Mutual Insurance . . . reportedly investigated the claim [of damages to the foundation on Jang's and Park's property] and did not afford coverage." (Dkt. #36, Exh. P, at 2).   Plaintiffs, however, assert that "Liberty conducted no investigation and made no effort to determine the cause of damage present" in the plaintiffs' home before denying the claim.  (Dkt. #37, at 35). Plaintiffs point to a document created on August 11, 2015 by "Brian Barrazue" which included that Jang reported to Liberty Mutual that "no incident occurred, [Jang] only became aware of the wall collapsing when he got the home inspected in March as he was putting it up for sale." (Dkt. #37, Exh. AA.3).  The note continues: "I [Liberty's representative] explained exclusion for settling and earth movement.  [Jang] understood. I explained that I will send letter via mail which details the policy. [Jang] thanked for time and understood." (Id.).  The note reflects that defendant summarily denied plaintiffs' claim without any investigation. Additionally, Jang testified that after he reported his claim to Liberty, "Liberty Mutual did not send anyone[]" to look at his property. (Dkt. #36, Exh. C at 45).   Under the circumstances of this case, given that the claim was not made and denied until 2015 when Liberty Mutual

was aware of the dispute over coverage for this type of claim,[22] a reasonable jury could conclude that Liberty Mutual did not conduct an investigation,[23] and in failing to do so, despite its knowledge of claims of this kind, acted in bad faith.  Thus, viewed in the light most favorable to the plaintiffs at this stage of the case, material issues of fact exist as to plaintiffs' bad faith claim.

### C. VIOLATIONS OF CUTPA AND CUIPA

Liberty Mutual seeks to dismiss the claims under CUIPA and CUTPA on grounds that plaintiffs have failed to show that Liberty engaged in a general business practice of unfair claims handling practices with such frequency as to constitute a general business practice. (Dkt. #35, at 36-40).  "A plaintiff may assert a private cause of action based on a substantive violation of CUIPA through CUTPA's enforcement provision."  Karas, 33 F. Supp. 3d at 116-17 (citations omitted).  "To succeed on such a CUTPA claim, a plaintiff must show that the defendant engaged in an act prohibited by CUIPA's substantive provisions, and that the act

---

[22]This case differs from the circumstances summarzied by Judge Bolden in Gabriel, in which case Judge Bolden granted summary judgment on this claim given that although "courts in this District have denied summary judgment regarding the breach of contract claims, . . . most of those decisions postdate the denial of" the 2014 claim made in that case, and in Gabriel, plaintiffs had not "placed testimony from Liberty Mutual employees in charge of claims processing in the record, or demonstrated that Liberty Mutual employees denied the claim in bad faith."  2017 WL 6731713, at *10.  At this stage of the case, this Court does not conclude that there is evidence that the claim was denied in bad faith, but rather, that there is a genuine issue of fact as to whether a lack of investigation into a claim of this nature in 2015 was done in bad faith.

[23]In Belz, Judge Bolden pointed out the "evidence that Peerless acted reasonably in its investigation and denial of the Belzes' claim[]" in that "[s]hortly after the claim was filed, Peerless dispatched an engineer to inspect the property, and the engineer's report concluded that the basement walls were structurally sound and made no indication that hidden decay was the cause of cracking."  204 F. Supp. 3d at 467.  Similarly, in Roberts, Liberty investigated the claim by dispatching an engineer to analyze the home.  264 F. Supp. 3d at 401.  In this case, despite stating that it conducted an investigation, Liberty has not provided evidence of an "investigation" prior to the denial of the claim.

proximately caused the harm alleged." Belz, 46 F. Supp. 3d at 165 (citation omitted).[24]  The

court must consider "whether the plaintiff has made facially plausible factual allegations that,

in the circumstances of the particular case, the defendant has engaged in the alleged

wrongful acts enough to suggest it has a general business practice of doing so."  Id., citing

Karas, 33 F. Supp. 3d at 116 (additional citation  omitted).   "It is clear that a plaintiff must

show more than a single act of insurance misconduct[,]" however, "what constitutes a

'general business practice' and the frequency with which the plaintiff needs to prove that the

defendant has unfairly resolved claims are far less clear."  Belz, 46 F. Supp. 3d at 165-66

(multiple citations & internal quotations omitted).

        As Judge Bolden observed in his recent decision in Gabriel, like the claims brought

in Count Two regarding the breach of implied covenant of good faith and fair dealing,

"courts in this District have diverged on addressing nearly identical claims contained in Count

[Three – violations of CUTPA and CUIPA]." 2017 WL 6731713, at *10 (citations omitted).

At the Rule 12(b)(6) stage in Belz,  Judge Hall concluded that three allegations of unfair

settlement practices, "[i]f proven,. . . contain sufficient facts to show that Peerless, as a

member of Liberty Mutual Group, has a general business practice" that would support a claim

under CUIPA.  46 F. Supp. 3d at 167.  Later, at the summary judgment stage in that case,

Judge Bolden concluded that "Peerless ha[d] not provided evidence contradicting the Belzes'

claim that Peerless has a practice of refusing to settle 'concrete decay' claims without

litigation."  Belz, 204 F. Supp. 3d at 468.  Similarly, in Metsack, Judge U.S. District Judge

Vanessa L. Bryant found a genuine issue of material fact as to whether the insurance

_____

        [24]Thus, stated another way, "unless an insurance related practice violates CUIPA or . . .
some other statute regulating a specific type of insurance related conduct, . . . it cannot be found
to violate CUTPA."  Belz, 46 F. Supp. 3d at 167, quoting State v. Acordia, 310 Conn. 1, 37, 73 A.3d
711 (2013).

company engaged in unfair business practices because "[i]n addition to offering evidence that Liberty Mutual did not sufficiently investigate their claim, [p]laintiffs [in that case] have offered evidence that Liberty Mutual and its affiliates have been involved in [nineteen] separate lawsuits" of this kind.   2017 WL 706599, at *9.   However, in <u>Roberts</u>, Judge Underhill concluded that "the existence of other nonbinding decisions that deemed Liberty Mutual potentially liable would not make it 'reasonably clear' that Liberty Mutual violated CUTPA/CUIPA."   264 F. Supp. 3d at 416 (footnote omitted).   Similarly, in <u>Gabriel</u>, Judge Bolden held that plaintiffs had "not put any evidence into the record supporting that Liberty Mutual had a general practice of denying these claims regardless of each claim's merit." 2017 WL 6731713, at *10.   As in <u>Roberts</u>, in <u>Gabriel</u>, the Judge Bolden commented that "[w]hile there are several decisions denying summary judgment on similar policy language, . . . these decisions are non-binding and do not clearly establish liability."   <u>Id.</u>, <u>citing Roberts</u>, 264 F. Supp. 3d at 416.

In this case, plaintiffs' assertion in support of this claim is the existence of the denial of multiple identical claims for coverage (<u>see</u> Dkt. #37, at 38-39).   However, plaintiffs do not support their CUTPA/CUIPA with record evidence, "such as depositions with insurance company employees or other relevant individuals."   <u>Gabriel</u>, 2017 WL 6731713, at *10.   As Judge Underhill has stated, a district court's "denial of summary judgment does not make liability . . . reasonably clear" <u>Roberts</u>, 246 F. Supp. 3d at 416 (citation & internal quotations omitted), and "[u]nless and until a higher court rejects Liberty Mutual's position, the insurer is entitled to continue making its (hitherto unsuccessful) arguments with respect to coverage, without exposing itself to liability under CUTPA/CUIPA."   <u>Id.</u> (citations omitted).   Thus, at this stage, there is not enough information from which a reasonable jury could conclude that

Liberty Mutual violated CUTPA/CUIPA.  Accordingly, defendant's Motion for Summary Judgment as to Count Three is <u>granted</u>.

IV. CONCLUSION

For the reasons set forth above, defendant's Motion for Summary Judgment (Dkt. #34) is <u>granted with respect to Count Three (CUTPA/CUIPA) but denied in all other respects</u>.

<u>See</u> 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen calendar days after service of same);**  FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Impala v. United States Dept. of Justice</u>,  670 F. App'x 32 (2d Cir. 2016)(failure to file timely objection to Magistrate Judge's recommended ruling **will** preclude further appeal to Second Circuit); <u>cf. Small v. Sec'y, H&HS</u>, 892 F.2d 15, 16 (2d Cir. 1989)(failure to file timely objection to Magistrate Judge's recommended ruling **may** preclude further appeal to Second Circuit).

Dated this 22nd day of February, 2018, at New Haven, Connecticut.

_/s/ Joan G. Margolis, USMJ_____
Joan Glazer Margolis
United States Magistrate Judge